**Thomas J. SHERMAN, Jr., Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**Civ. No. 2577.**

United States District Court
D. Hawaii.

Dec. 16, 1966.

David L. Irons (court appointed), Honolulu, Hawaii, for petitioner.

Herman T. F. Lum, U. S. Atty., James F. Ventura, Deputy U. S. Atty., District of Hawaii, Honolulu, Hawaii, for respondent.

## DECISION

PENCE, Chief Judge.

*Statement of the Case*

On July 7, 1966, Thomas Joseph Sherman, Jr., with his appointed attorney Raymond J. Tam present, entered a plea of guilty before United States District Judge C. Nils Tavares to an indictment charging that on October 13, 1965, he, Sherman, made a long distance telephone call from Honolulu to California by (falsely) representing himself to be the owner of a telephone credit card, and thereby violated 18 United States Code § 1343. Within an hour after his plea, he was sentenced for a term of five years (the maximum) and for a study under 18 United States Code § 4208(c). Before sentence, the court did not ask Sherman if he wished to say anything before sentence, nor did Sherman ask for or make any allocution under Rule 32(a) (1) of the Federal Rules of Criminal Procedure.

While awaiting transportation to the Federal Correctional Institution at Lompoc, California, on July 10, 1966, Sherman sent to this court a "letter motion" for a new trial. The "letter motion" was sent without the advice or knowledge of his attorney, Tam, and in it Sherman indicated that he desired to proceed *in*

*pro. per.* without Tam. Judge Tavares being absent, at a hearing on July 14, without Tam present, Sherman's motion was construed by visiting Judge Lindberg as a motion for withdrawal of his plea of guilty. Upon Judge Lindberg's indicating that since Judge Tavares would be back the following week—July 21 or 22—he would order the United States Marshal not to transfer Sherman outside the district until Judge Tavares returned, Sherman said:

> "I think this would defeat the purpose of my petition, your Honor. Under those conditions, if it would have to be heard before Judge Tavares, I withdraw the petition." (Tr. p. 37.)

Sherman stated further:

> "[L]et the record reflect that the defendant withdrew his petition at this time. * * *" (Tr. p. 38.)

On July 19, 1966, a "letter motion" for change of plea was received by the court. The letter was dated July 17, 1966, and was apparently mailed in the afternoon of July 18, 1966, and by the time the court received it on July 19th, the defendant was already on his way from Hawaii to Lompoc. On August 3, 1966, Judge Tavares wrote Sherman that he would defer acting upon the "letter motion" until after Sherman's return to Hawaii following the study.

While at Lompoc, Sherman filed in this court a motion (incorrectly naming Warden Minton, of the Federal Correctional Institution at Lompoc, as Respondent) dated September 27, 1966 and filed October 12, 1966, under 28 United States Code § 2255, urging:

(a) that the sentence imposed upon him was invalid because he had not been allowed allocution, with an added objection that no presentence report had been made before sentencing;

(b) that he "was drugged with dangerous narcotics at plea time", with narcotics given to him by the "United States Marshal and the warden of the Honolulu Hawaii County Jail" whereby he was rendered "almost senseless at the time of plea" and therefore compelled "to give a plea under extreme duress and not in full control of his powers of understanding";

(c) that he had "made application to stop imposition of sentence and to 'correct a manifest injustice', two applications were denied by inaction and petitioner was removed to California out of the district."

In this motion, Sherman stated that the facts supporting it were that (a) he "was sentenced mute and did not waive right to make a statement in his own behalf"; (b) he "clearly stated for the record that he was in fact under medication at the time of plea"; and (c) he had "made application for change of plea [on] July 7, 1966, July 17, 1966 and July 19, 1966."

Sherman was returned to this district for sentence following study and (with Judge Tavares being ill) on October 12, 1966, appeared before this court (with Chief Judge Pence presiding) together with his court-appointed attorney Tam, at which time the court set October 25, 1966 for a full hearing on all of Sherman's motions.

During the October 12 session, Sherman's attorney, Tam, requested that he be allowed to withdraw as counsel. In one of his many letter communications to Judge Tavares, on August 20, 1966, Sherman had requested that Tam "be removed" as his attorney. On October 12 however, Sherman protested that he was satisfied with Tam. Tam, nevertheless, urged that in view of Sherman's motions and letters he was "not sure whether I [Tam] could justifiably represent" Sherman; that he, Tam, had "consulted with him [Sherman] at length on the plea * * * and it is * * * somewhat disturbing to myself that these events have come up since that time. And these are not based on my advice, but, frankly, on Mr. Sherman's own volition." (Tr. pp. 49–50.) This court, foreseeing from the nature of the allegations set forth in Sherman's motions that Sherman's testimony at the hearing might well reflect upon the integrity of Tam and the effectiveness of his representation, permit-

ted Tam to withdraw and appointed new counsel.

The trial on Sherman's motions and § 2255, beginning October 25, 1966, consumed almost three days. From the records in the court's open files and the testimony at trial, and exhibits introduced, this court makes the following

*Findings of Fact:*

On October 26, 1965, Sherman was arrested in this district (see file in Criminal No. 12,105) and charged with fraud by wire under 18 U.S.C. § 1343.

Tam, as indicated, was promptly appointed by the U. S. Commissioner as Sherman's attorney. Tam has been a member of the bar of this court since 1958, has had broad and general experience, including some 15 to 20 criminal cases, five of which involved trial. Four of his criminal cases were in the Federal court.

Following preliminary legal skirmishes, Sherman was indicted in this district for the same crime here involved. Tam filed a motion for a bill of particulars, and in response thereto the United States Attorney disclosed to Tam the data and information concerning Sherman's acts which made the bill of particulars unnecessary. Sherman's bail had been originally fixed at $500, which Sherman could not procure, but Tam was successful in getting it reduced to $1.00. During the months of December 1965 and January 1966, Sherman, through Tam, endeavored to have his case transferred to Pennsylvania under Rule 20, for a plea of guilty there. This endeavor came to naught because Sherman had been arrested and held in this district.

Without advising his attorney—or the government—before March 1966 Sherman left Hawaii, without permission of his attorney or anyone in authority. The more particularized indictment of the present case was returned on April 14, 1966, a bench warrant was issued, and he then being under arrest in Miami, Florida, on other charges, Sherman was returned to Hawaii on June 4, 1966. On June 7, he was arraigned and Tam was

again appointed as his counsel on this second indictment. (The first indictment was subsequently dismissed.)

Sherman claims that he became an epileptic in about 1962 and states that when he was returned from Florida to Hawaii he brought back with him about 50 capsules of sodium dilantin combined with ¼ grain of phenobarbital. He also brought back a psychiatric report made in December 1964—so the court understands (the report never having been offered in evidence)—by a Doctor Haber, a court-appointed psychiatrist in Maryland, wherein Sherman was determined to be incompetent to stand trial at that time on another criminal charge, there. The copy which Sherman had with him in Hawaii was not signed or certified.

On June 14, 1966, the U. S. Attorney moved the court for a judicial determination of the mental competency of the defendant and on June 15 the court ordered a mental examination by Dr. Wm. J. T. Cody, a psychiatrist. Dr. Cody's report was dated June 30, 1966, and was received by Judge Tavares at 8:00 A.M. on July 5. Dr. Cody found Sherman to be "mentally competent and * * * able to understand the proceedings against him * * * [as well as] assist in his own defense * * * provided he is not permitted to act as his own counsel." Dr. Cody further stated that "Sherman deserves the benefit of extended and intensive psychiatric care or study in a mental hospital at some point in the near future." A copy of this report was made available to the U. S. Attorney and to attorney Tam several days before July 7, 1966, when, at 11:00 A.M., Sherman, together with his attorney Tam, appeared in court for plea.

Judge Tavares then, July 7, stated that, subject to objections based upon Dr. Cody's report, he was prepared to hold that the court was in a position to go to trial. Tam thereupon said: "We do not question the [medical] report at all. This plea today is being made at the request of the defendant. He wants to make his plea at this time." (Tr. pp. 21–22.) Upon the court inquiring of Sher-

man what was his plea, Sherman responded: "Guilty, your Honor." (Tr. p. 22.)

Judge Tavares, before accepting the plea, inquired of Sherman if he was "influenced in any way by any threats or other compulsion, attempts of coercion made on [him] by anyone in the service of the Government" to force him or to try to get him to plead guilty, by threats or pressure, and Sherman replied: "No, your Honor", that he was making the plea voluntarily. Judge Tavares then inquired: "You don't claim to be under the influence of * * * drugs * * * this morning?" Sherman replied: "No, your Honor, except the normal medication." (On June 22 there had been a court conference, with Sherman, Tam and Assistant U. S. Attorney Donahoe, etc., present, over a complaint by Sherman that he was not receiving the proper drugs at the jail for his epileptic condition, so Judge Tavares was familiar with the fact that Sherman was taking dilantin and librium for his epileptic condition.) (Tr. p. 22–23.)

Judge Tavares continued: "But you don't contend at this moment, do you, that you are in a mental condition that is such that you are not in a position to make an intelligent plea? You are not making such a claim? Sherman replied: "No, your Honor."

The record continues:

"THE COURT: What is the maximum penalty?

 *    *    *    *    *    *

"MR. DONAHOE: * * * It is 5 years or $5,000.

 *    *    *    *    *    *

"THE COURT: You understand that? * * * Have you told your lawyer everything that you know or can think of about the case so that he is in a position to advise you properly?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: * * * Do you have any complaints about the way your attorney has represented you up to now? Sometimes people come in later and say to the Court, 'Well, I wasn't quite satisfied with the way my lawyer handled the case.'

"THE DEFENDANT: I would have to say just the opposite. I was very well represented.

"THE COURT: Very well. The Court will accept the plea of guilty, and upon your plea will refer you to the Chief Probation Officer for pre-sentence.

"MR. TAM: I wonder if I can interfere at this point?"

From the above, it thus appears that the court received the plea of guilty in a perfectly normal manner from a defendant represented by counsel, the defendant representing to the court that he was in full command of his faculties and making an intelligent and understanding plea of guilty.

As the record discloses after the plea of guilty was entered, that some confusion arose, was solely due to the acts and representations of Sherman and his attorney. Both Sherman and his attorney wanted Sherman to be sent at once to Lompoc for "medical or mental evaluation before the presentence report." (Tr. p. 25.)

In order, at once, to expedite Sherman's request for immediate transfer to a mainland institution, Judge Tavares, in the absence of the defendant, in chambers, but with the Assistant U. S. Attorney and Tam present, telephoned to the Federal Correctional Institution at Lompoc to secure its cooperation. The court, in open court, thereafter advised Sherman of this fact, advised him that he would be given a "temporary maximum sentence, but it is subject to revision", and that in some 90 days he would be returned back to Honolulu for the final sentence. The court advised the defendant that he might even go to Terminal Island rather than Lompoc because the Bureau of Prisons decides which one of the study institutions to take.

Between the time the plea of guilty was accepted and the sentence was im-

posed some minutes thereafter, Tam had repeatedly urged that Sherman be transported to the mainland immediately, e. g., "What Mr. Sherman was quite anxious about was whether there would be any type of delay. * * *"

Without specifically asking the defendant or his attorney if either or both had anything they wished to say before sentence, Judge Tavares then proceeded to state:

"[T]he defendant being accused under Section 1343, I find that the maximum penalty is $1,000 fine or 5 years [though Donahoe had said $5,000 or 5 years], or both. It is adjudged that the defendant is hereby committed for the maximum period authorized by law, which is five years, and for a study as described in 18 U.S.Code, Section 4208(c). The result of such study to be furnished this Court within three months, unless the Court grants further time, not to exceed three months, whereupon the sentence of imprisonment herein imposed shall be subject to modification in accordance with 18 U.S.Code, Section 4208(b)." (Tr. p. 32.)

The order for the above was prepared and signed, whereupon Judge Tavares left Hawaii to attend the Judicial Conference of the Ninth Circuit in California.

An airline strike against the United and Northwest Airlines (these two, with Pan American, being the only airlines serving Hawaii—mainland U. S. travelers) upset all normal transportation schedules and the defendant's transportation to the mainland was delayed. It was during this period of delay that Sherman filed his "motion for a new trial" of July 10, 1966, which was heard by Judge Lindberg as referred to above.

At the instant trial, Sherman testified that the routine at the Honolulu jail was that a guard four times a day, beginning at 5:30 A.M. and ending at 10:30 P.M., delivered to him one capsule of sodium dilantin with ¼ grain phenobarbital and one capsule of librium; that sometimes the guard would deliver three capsules;

that Sherman would and did collect these extra capsules and that on July 6 and 7 he had a considerable quantity of capsules in his possession. He further stated he was not sure what the indictment (of April 14) was; that he had not read it, when he went into court on July 7, 1966.

The court finds that this statement was a pure fabrication. The transcript of the June 7 hearing shows that with his counsel present, he was given a copy of the indictment, and as Tam testified, he had not only gone carefully and fully into the facts surrounding the April 1966 indictment with his client after June 7, but he had also gone fully into the same facts in October 1965—January 1966, and had fully discussed all aspects of petitioner's actions in connection with his fraud by wire, including Sherman's modus operandi.

As indicated by everyone who came in contact with him—Dr. Cody, his attorney, Assistant U. S. Attorney, the United States Deputy Marshal and this court—Sherman's "intelligence appears to be at least average, probably better." (Dr. Cody.) The court finds that Sherman was in every way fully aware and apprised of the charge to which he pled guilty long before he entered his plea.

Sherman stated that Tam had constantly talked to him about "deals" with the U. S. Attorney since October 1965, and that these offers of deals (so he said his attorney hold him) had always originated with Assistant U. S. Attorney Donahoe; that about a week before July 7, and before Cody's report was received, Tam had reported that he, Tam, had an offer from the U. S. Attorney that after Sherman had pled guilty the U. S. Attorney would guarantee three months, and that Sherman answered "No" to that offer—"not until I get the psychiatric report back." Sherman stated that on June 22, Tam had reported that Assistant U. S. Attorney Donahoe had offered him, for a plea of guilty, a promise of only three months in jail but that he, Sherman, told Tam that "he was not guilty and I couldn't lose the case"; that Tam had told him in the cell block in the U. S. Marshal's office on

the morning of July 7 that the U. S. Attorney said that if he would plead guilty and go to the mainland for three months that he would get probation; that on the morning of July 7 in his own mind he was not going to plead guilty and that he told Tam that morning that he was not guilty and that he didn't decide to plead guilty until after 9:00 A.M. on July 7th.

The court finds that there is no truth in these statements of the petitioner. The court believes the testimony of Tam and Donahoe on this point. Both Tam and Donahoe deny that the U. S. Attorney offered any deal, or made any promises, or made any guarantees of sentence if Sherman would plead guilty. The court believes Tam when Tam said that at no time did he ever tell Sherman that the United States had offered a deal, or had made any guarantee. The court believes Tam and believes Donahoe in their testimony that he, Tam, made inquiry of Donahoe as to what Donahoe thought Sherman's sentence would possibly be if Sherman pled guilty, and in their statements that all conferences which he, Tam, had with Donahoe were instituted by Tam, except when Donahoe telephoned Tam to say that Sherman "had flown the coop" when Sherman left Hawaii for Florida. The court believes Tam when he said that Donahoe had never made any promises; that all that Tam had done was ask him, Donahoe, what he thought might be the sentence if Sherman pled guilty. The court believes Tam when he said that Donahoe did not promise "just 90 days" nor did he make any other guarantee. The court believes Tam when he said that on all occasions after he, Tam, had talked to Donahoe that he, Tam, had told Sherman that regardless of what the U. S. Attorney might recommend, the court would have the final say and that he, Tam, told Sherman several times that if he pled guilty there was no guarantee of what might happen. The court believes Tam when he stated that, in court on July 7, Donahoe had said that if he, Sherman, pled guilty there was no guarantee of what the court might do.

The court believes Tam when he said that he went over the entire matter with Sherman on July 7th, beginning at 8:00 A.M., for about one-half hour in the U. S. Marshal's cell block in the Courthouse, and on that occasion Sherman said he wanted to plead guilty.

The court takes note that from October 1965 Sherman had wanted to get a Rule 20, under the Federal Rules of Criminal Procedure, transfer to Pennsylvania which—if made—could have been made only if Sherman were to plead guilty. Likewise, Sherman's attempt to take a Rule 20 plea on the instant indictment while still in Miami (frustrated, apparently, only because Sherman was returned to Hawaii so quickly) also indicates that Sherman intended to plead guilty long before July 7, 1966.

As shown on Exhibit A in Sherman's own handwriting, in an unsolicited letter under date of June 8, 1966, Sherman wrote to Donahoe:

"At the conclusion of the forthcoming psychological evaluation I wish to be arraigned as soon as possible. My plea at that time will most assuredly be a 'Guilty Plea'. The time for fooling around is long past, not that I couldn't win these cases at great expence [sic] to the Government.

\* \* \* \* \* \*

"I have been in the crime business very unsuccessfully for four years \* \* \* of which I have spent two years in jail waiting trials but not convicted. I am tired, old, weary and sad."

The court believes Tam when he testified that Sherman had carefully explained to him, Sherman's modus operandi of his crime, and this court saw the telephone digits, exhibited in court by Tam, in Sherman's own handwriting, in Tam's notes of his interviews with Sherman. The court believes Tam when he said that he, Tam, was satisfied that Sherman was guilty of the crime charged.

The court finds that when Sherman pled guilty on July 7, not only was he guilty as a matter of law and fact but

also in entering his plea he did only that which he had long before decided to do. The court finds that Tam did not tell Sherman that he could always withdraw his plea of guilty.

Sherman testified that after his plea was made he told Tam that it still wasn't the right thing—"let's stop this right now"—and that Tam had told him, "No, no, keep quiet." The court does not believe this statement. Instead, it believes Tam's statement that Sherman's possible reference to a change of plea was in connection with his, Sherman's insistence, after his plea—in whispered conversation with Tam, in court—that he "want[ed] to go immediately * * * otherwise I want to change my plea"—and that Tam said "Hush", to stop the whispering and told Sherman "they would do their best to send him as soon as possible."

As indicated above, in his motion under Section 2255, Sherman had charged that he "was drugged with dangerous narcotics at plea time"—given him by the U. S. Marshal and the jail warden so that he was "almost senseless at time of plea and not in full control of his powers of understanding."

In connection with that charge, Dr. Gordon Popper, a neurologist, was called, out of order, as a witness for Sherman. He had never examined Sherman. He was given a hypothetical problem—under promise to connect—as to the effect of dosages of the three drugs—sodium dilantin with ¼ grain phenobarbital and librium—upon persons. The doctor's testimony, in substance, was that the taking of such drugs was not an abnormal treatment for an epileptic and that a dosage of one capsule of dilantin with ¼ grain phenobarbital and one 25 mg. capsule of librium four times a day would not have impaired the faculties or confuse the mind of a man 31 years of age weighing 200 lbs.; that a tolerance for the same would be built up and that such a person should be able to carry on his normal functions, movements and thinking. He said that a big man can handle more than the normal dose, and an anx-

ious person can handle larger doses without producing mental or physical deterioration.

Dr. Popper was asked as a hypothetical question, based upon the above indicated daily dosages, what the effect would be if Sherman had taken two dilantin and phenobarbital capsules and three librium capsules on July 6, 1966 at 10:00 P.M. and four dilantin with phenobarbital capsules and six librium on July 7 at 5:30 A.M., and two dilantin with phenobarbital and three librium around 9:00 A.M. on July 7. The doctor said that if such dosages were taken, this should result in a marked increase in the slowing of thought processes as well as drowsiness; that Sherman would have trouble making intelligent decisions; that on July 7, to a layman, the outward physical appearance of such a person would be that he would look drowsy, his speech would be slurred and slower, and he would have a dazed look.

The doctor also said that the person who took such a massive dosage would have some awareness of the effect. The doctor further testified that if he had taken but his normal dosage on July 6 and 7, the drugs would have no marked effect upon his mental processes.

Exhibit 1, the statement of Michael Patrick Moeller, Sherman's cell mate in Halawa Jail, if believed, would give the impression that Sherman had taken an extra large dosage on some day—inferentially the morning of July 7—because Moeller said: "When he went to make his plea he was heavily dosed up." Moeller himself is confronted with psychiatric problems—he is "the Pali sniper" who had taken a rifle to a spot overlooking the popular Pali viewpoint and then had causally shot at and killed a tourist and a policeman, and wounded others. His story of the amount of capsules taken, however, does not fit the facts testified to by Sherman. Moeller indicated that Sherman's maximum "surplusage" of capsules, both dilantin with phenobarbital and librium, was but seven, and his testimony might be construed as indicating that Sherman took them all on the morn-

ing of July 7. Sherman, however, testified that on July 6 at 10:00 A.M. he took four dilantin with phenobarbital plus three librium (i. e., five capsules more than given by the guard), and on July 7 at 5:30 A.M., according to Sherman, he took six dilantin with phenobarbital and three librium (seven more than the dosage delivered by the guard) and between 8:30 and 9:00 A.M. he took four dilantin with phenobarbital and four librium (six more than delivered by the guard). In order to do this, he would have had to have a supply of eighteen extra capsules —not a maximum of seven testified to by Moeller. The court also notes that the dosages which Sherman testified he took were far larger than those dosages which were presented to Dr. Popper in the hypothetical question.

The court was also impressed with the competence of Sherman's new counsel, David Irons, and the court does not believe that the number of capsules presented in the hypothetical question were conjured up by Mr. Irons. The court can only infer that those figures were dosages as given to attorney Irons by Sherman. It would appear, therefore, that Sherman himself either has no knowledge of the number of capsules he took—if any—more than the normal, or that he deliberately misrepresented the number, or that he lied to his attorney, or he lied to the court.

The court finds that he lied to both the attorney and to the court, not only because of the above discrepancies but because of the testimony of his former attorney Tam, U. S. Deputy Marshal Gerlach, and Assistant U. S. Attorney Donahoe, each of whom had talked to and observed Sherman on many occasions before and on July 7. On the morning of July 7, Gerlach who had been with Sherman from the time he picked him up at the jail before 8:00 A.M. and brought him to the Federal Courthouse, some eight miles, and had been with him off and on thereafter through the rest of the morning; Tam, who had been with Sherman from about 8:00 A.M. off and

on through the rest of the morning; and Donahoe who likewise had observed him off and on during the morning of July 7—each and every one of them testified that there was no difference in Sherman's physical appearance, muscular movements or manner of speech from that which they had observed in their many prior contacts with him. Tam, Donahoe and Gerlach indicated that Sherman's appearance, movements and speech were similar to that exhibited in court by him during this trial.

The court concludes that Sherman had not taken any more than his normal dosage on either July 6 or July 7 and that his physical and mental condition at the time he appeared in court was normal for him; that the only drugs which he had taken were as he then stated to Judge Tavares: that he had taken no drugs except his normal medication. Sherman had not been drugged by the U. S. Marshal or the guard at the jail on July 6 or July 7 and he was not "almost senseless at the time of plea", but to the contrary was in full control of his powers of understanding.

As the court observed Sherman during the trial, he did not appear to be under the influence of any drugs whatsoever. His eyes were not glazed or dull, his movements were not slow, and his speech was not slow, or slurred, or halting. Rather, it appeared to the court that he had had full command of his mental faculties at all times during the trial, his responses to questions on direct and cross-examination indicated a good intellect and a full awareness of the meaning of the questions and his responses thereto. The court also concluded that fact and fiction, truth and falsehood, flowed with equal ease off his tongue.

Sherman was under no duress whatsoever but rather, made his plea fully understanding the charge, knowingly and wilfully intending to plead guilty, and did plead guilty thereto on July 7, 1966. From the testimony of Sherman, Assistant U. S. Attorney Donahoe, and his first attorney Tam, as well as from the tran-

script of the proceedings before Judge Tavares of July 7, the court is satisfied that somewhere and at some time prior to the time he entered his plea of guilty before Judge Tavares on July 7, Sherman had decided that he needed psychiatric observation and treatment of a nature which he could not get at Halawa Jail. Both he and his attorney were of the opinion that the facilities at Lompoc would give him observation and would assist in psychiatric treatment. (The court does not know what psychiatric treatment, if any, was given him while he was at Lompoc.)

Sherman, in his letter of August 8, 1966 to Judge Tavares, in which he refers to his motion for change of plea, writes:

"The defendant is well aware that he could have hearing on this matter forthwith but wishes to defer said motion until such time as he has completed the period of study here in California. *The defendant's plea was for such a study.* This institution, in the defendant's untrained estimation, is of the best of its kind and the defendant is gaining the maximum benefit from his stay." (Emphasis added.)

The court concludes that Sherman was under no duress of any sort—other than that which was possibly self-imposed, i. e., the desire to get out of Halawa Jail and into an institution where he could get psychiatric study and possibly treatment.

Although attorneys Tam and Donahoe each felt that the plea of guilty would expedite a study and possible psychiatric treatment for Sherman, and each separately was satisfied as to the guilt of Sherman to the charge, Sherman's decision to plead guilty was solely his own, and, as indicated in his answers to Judge Tavares' questions immediately prior to his plea, was not induced by any suggestions of leniency or through promises, duress, or coercion of others.

The court concludes that Sherman himself, both at the time of sentence and subsequent thereto, was "very well represented" by attorney Tam, and the advice of attorney Tam was sound and made with the best interests of the client in mind.

*Conclusions of Law*

■ As indicated during the course of his testimony, Sherman said that he was not guilty, that he had told his attorney he was not guilty, that he did not want to plead guilty because he wasn't guilty, etc. He also said that his attorney had reported to him that Donahoe had repeatedly offered him "deals"—probation, 90 days in jail, etc., if he would only plead guilty; that when he came to the courthouse on July 7, he still did not intend to plead guilty because he wasn't guilty but that he had been misled by his attorney into pleading guilty on that morning. The totality of Sherman's testimony in this regard was such as to put the integrity and reputation of attorney Tam at issue. Most of Sherman's statements involving the above claims had been made upon direct examination. When Tam testified, the court ordered Tam, over defendant's objection, to disclose the communications made by Sherman to him in connection with Sherman's guilt or innocence. Sherman's testimony had put in issue the nature of Tam's advice, and the court then held, and reiterates, that Sherman, by his testimony, had waived his privilege as to communication with his counsel.[1]

Sherman's "motion for a new trial" of July 10, 1966 sets forth no specific grounds for a change of plea (as the motion was deemed by Judge Lindberg) other than "mental incompetency" during Sherman's trial; the alleged ground for the "motion" apparently arose from what

1. Hunt v. Blackburn, 128 U.S. 464, 9 S.Ct. 125, 32 L.Ed. 488 (1888); Cooper v. United States, 5 F.2d 824 (6th Cir. 1925); United States v. Goo, 10 F.R.D. 332 (D.C. Hawaii 1951), aff'd. 187 F.2d 62, cert. denied 341 U.S. 916, 71 S.Ct. 735, 95 L.Ed. 1351.

Sherman felt were conflicting professional opinions of Drs. Haber and Cody. Judge Tavares had ruled on July 7 that he was accepting Dr. Cody's report that Sherman was competent to stand trial. Even if that July 10 "motion" had not been withdrawn voluntarily by Sherman, so that as the record now stands this court need not consider that motion at all, nevertheless upon that allegation alone, no court could legally be justified in allowing a change of plea under Rule 32(d).

The next "motion for change of plea" apparently is found in Sherman's letter of July 17, 1966 to Judge Tavares—received July 19, 1966. The only grounds given therein as to why he should be allowed to change his plea was his belief "that the plea given * * * was illegally given" and that the record "and certain facts sworn to and substantiated" will show "that the said plea was in fact illegal." There was certainly nothing in the record nor in the unverified alleged facts from which Judge Tavares could have found that manifest justice demanded that Sherman be allowed to withdraw his plea of guilty at that time. Since Judge Tavares did not rule upon it at that time, however, it is deemed by this court to have been merged into and is considered as part of the present motion.

In ground (c) of Sherman's allegations now before this court, Sherman maintains that his "application to stop imposition of sentence and to correct manifest injustice two applications were denied by inaction." The court can only construe that allegation (c) as applying to the above two "letter motions". The record discloses no motion of July 8, 1966, and the court can only infer that it refers to Sherman's July 10, 1966 letter-motion which Sherman withdrew when he appeared before Judge Lindberg.

As above indicated, the record clearly discloses that Judge Tavares did not comply with Rule 32(a) (1) of the Federal Rules of Criminal Procedure. After Sherman had pled guilty, but before sentence was imposed, Sherman was not asked if he wished to make a statement. Instead, after considerable discussion in open court of what the court had done to expedite Sherman's transfer to the mainland and that Sherman would be sentenced under 4208(b), Judge Tavares sentenced him under 4208(b) for 5 years of imprisonment—the maximum as provided by law—and for a study under 4208(c).

■ The Supreme Court under similar facts in Hill v. United States, 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417, and Machibroda v. United States, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (both decided in 1962) has held that the failure of the judge specifically to inquire at the time of sentencing whether the defendant wished to make a statement on his own behalf, is not of itself an error that can be raised under 28 U.S.C. § 2255 or Rule 35, there being no "aggravating circumstances" accompanying the sentence such as were found in Andrews v. United States, 373 U.S. 334, 83 S.Ct. 1236, 10 L.Ed.2d 383.

Further, even if the present petition under 28 U.S.C. § 2255 or any of the "letter motions" might be construed as including a motion to correct an illegal sentence under Rule 35, Federal Rules of Criminal Procedure,[2] under Rule 35 Sherman was not illegally sentenced. Rather, his sentence was perfectly legal and correct under 18 U.S.C. § 4208(b).

■ Although the normal procedure before sentencing is that the pre-sentence investigation is made and presented to the court, there is nothing in any of the statutes or rules which demands that such a pre-sentence investigation or report be made, filed with the court or considered by the court before sentencing.[3] Likewise, there is nothing in the statutes or the rules which forbids the court to impose sentence upon a defendant immedi-

---

**2.** Andrews v. United States, supra at 338, 83 S.Ct. 1236.

**3.** Cf. McGann v. U. S., 233 F.Supp. 419 (D.Md.1964), aff'd. 347 F.2d 986 (4th Cir. 1965).

ately after he has been found guilty either by a plea of guilt or after trial. The court finds that the plea of guilty was voluntarily and knowingly made by Sherman. The record discloses that the petitioner himself wanted immediate sentence. As indicated, there was nothing illegal or invalid in the time or act of imposition of sentence upon Sherman.

It would appear from United States v. Behrens, 375 U.S. 162, 84 S.Ct. 295, 11 L.Ed.2d 224, and Corey v. United States, 375 U.S. 169, 84 S.Ct. 298, 11 L.Ed.2d 229 (both decided in 1963) where Behrens and Corey, like Sherman here, had each been sentenced under § 4208(b), that the time when allocution is most important is at the final sentencing, i. e., when the court has before it the results of the study and the recommendations of the Director of the Bureau of Prisons. Thus, if the petitioner's motion is here denied, by virtue of the *Behrens* and *Corey* decisions he would be given full opportunity of allocution under § 4208 (b) at a time "when the sentence that counts is pronounced." (*Behrens*, supra, 375 U.S. at 166, 84 S.Ct. at 297.)

As above indicated, the court has found that there was no bargain made by anyone with the petitioner to induce him to plead guilty. The actions of Tam in discussing the case and possible sentence with Donahoe, of weighing Sherman's alternatives of remaining in Halawa Jail, going to trial, or pleading guilty and going to an institution for study, are proper areas of inquiry and discussion by any competent lawyer, and Tam would have been derelict in his duty to Sherman if he had not done these very things. Tam clearly and often advised Sherman as to his rights and of the fact that neither Tam nor Donahoe nor anyone else could bargain for the court. It is normal and proper for a competent attorney to discuss sentence with the U. S. Attorney, particularly when, as in this case, the attorney is aware of the strength of the Government's case against his client and is satisfied of his client's guilt.[4]

That the petitioner may have wanted to leave Halawa Jail and wanted to get treatment, and that his attorney likewise felt that he should have treatment, may have been the motives which impelled the petitioner to utter the plea of guilty, but the facts here clearly show that such motives were self-induced, and Sherman having made his choice, "he cannot reverse it after he is dissatisfied with his sentence, or with other subsequent developments."[5]

All that is demanded under Rule 11, Federal Rules of Criminal Procedure, is that the court first determine that the plea is made voluntarily with an understanding of the nature of the charge. The record reflects that the obligations under this rule were fulfilled by Judge Tavares.

Rule 32(d) permits the filing of a motion to withdraw a plea of guilty. A defendant who enters a plea of guilty has no right as a matter of law to withdraw such plea even though sentence is not imposed.[6] While motions to withdraw a plea of guilty made before sentence are allowed with great liberality, the trial court has a wide discretion in passing upon a motion to set aside a plea of guilty, and even at that stage the action of the court will not be disturbed unless there is an abuse of that discretion.[7]

If this court were to determine that, because Sherman was not asked to and did not make a statement before sentence, the sentence imposed by Judge Tavares should be vacated and set aside[8] in or-

---

4. *Cortez v. United States*, 337 F.2d 699 (9th Cir. 1964).

5. *Kent v. United States*, 272 F.2d 795 (1st Cir. 1959).

6. *Richardson v. United States*, 217 F.2d 696, 699 (8th Cir. 1954).

7. *Friedman v. United States*, 200 F.2d 690 (8th Cir. 1952), cert. denied 345 U.S. 926, 73 S.Ct. 784, 97 L.Ed. 1357, rehearing denied 345 U.S. 961, 73 S.Ct. 937, 97 L.Ed. 1381.

8. 28 U.S.C. § 2255.

der that Sherman might have his allocution before sentence, one could assume that at that time Sherman would move for leave to withdraw his plea of guilty. This court states flatly that even if the court felt the law compelled it here to vacate and set aside the sentence, and if such a motion to withdraw the plea of guilty were then urged, nevertheless on the record before it, this court would not disturb Sherman's plea of guilty, feeling that to do so would impose a manifest injustice upon the court, counsel and the public.

■ A motion for withdrawal of a plea of guilty made after sentence, however, is conditioned upon a showing of manifest injustice to the defendant.[9]

The Supreme Court has decided that the first or "temporary" sentence imposed under 18 U.S.C. § 4208(b) is "a judgment of conviction [and] the defendant is committed under § 4208(b) 'to the custody of the Attorney General' as in the case of all sentenced prisoners."[10] This initial sentence and order of commitment under § 4208(b) is imposed only after the whole process of determination of court has been completed and satisfies the requirements of finality for purposes of appeal.[11]

Sherman's motions and this petition under § 2255 for leave to withdraw his plea of guilty were made after sentence and after he had been committed to the custody of the Attorney General and had started serving time under the court's judgment. At this time the sum total of all of the facts of this case and the law applicable thereto compels this court to find that there is not only no manifest injustice to Sherman but no injustice at all to him if his motions and petition are denied, and they are each and all hereby denied.

---

9. Kadwell v. United States, 315 F.2d 667, 670 (9th Cir. 1963); Pinedo v. United States, 347 F.2d 142 (9th Cir. 1965).

10. Corey v. United States, supra, 375 U.S. at 173–174, 84 S.Ct. at 302.

11. Corey, supra 375 U.S. at 174, 84 S.Ct. 298.